## SHELBY STEEL TUBE CO. v. STANDARD SEAMLESS TUBE CO.

(Circuit Court of Appeals, Third Circuit. February 26, 1923.)

No. 2904.

Patents 328—870,246, claims 2, 4 and 5, for making of seamless tubes, held void for want of Invention.

The Nicholson patent, No. 870,246, claims 2, 4, and 5, for a method for making seamless tubes, *held* void for want of invention, in view of the prior art; the advance in the art at the time of the issuance of the patent being due to another invention.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by the Shelby Steel Tube Company against the Standard Seamless Tube Company for infringement of a patent. From a decree dismissing the bill, complainant appeals. Affirmed.

D. Anthony Usina, of New York City, and Frederick P. Fish, of Boston, Mass., for appellant.

J. Bruce Orr and Frederick W. Winter, both of Pittsburgh, Pa., and Livingston Gifford, of New York City, for appellee.

Before WOOLLEY and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This is a suit for infringement of Letters Patent No. 870,246, issued November 5, 1907, to John H. Nicholson, assignor to National Tube Company of Pittsburgh, Pennsylvania, for a method of making seamless tubes, and is here on the complainant's appeal from a decree of the District Court dismissing the bill on the ground that the patent is invalid for want of invention in view of the prior art. Claims 2, 4 and 5 are involved.

As the decision of this case may affect the whole seamless tube industry, it is important that the reasons for the decision be fully given.

We shall first examine the patent with reference to its validity. The patentee, in his specification, states the prior art and the purpose of his invention as follows:

"Heretofore in the manufacture of hot-rolled blanks from pierced billets for the purpose of cold drawing, a plug-mill of the well-known type is one of the common devices that has been used; the hollow billet is elongated in this mill and the thickness of its wall reduced to a sufficient gage or thinness, so that the same can be cold drawn with smooth surfaces to the desired thickness of wall. In this plug-mill operation it is desirable to produce hot-rolled blanks, or tubes, as round and as smooth on the inside as possible, to facilitate the cold-drawing and enable the tube to be finished to the desired gage and to smooth-finish it in as few cold-drawing passes as possible. Heavy reductions cannot be taken on the cold draw bench, without excessive breakage, until the rolled blank has been rounded up and the interior scratches removed,

owing to the tendency of the metal to pick up, or accumulate, ahead of the mandrel during the cold-drawing. To partly overcome this difficulty, the rolled blanks are given several additional passes on the plug-mill for the purpose of rounding up the diameter and smoothing the interior surface, little or no work being done in reducing the thickness of wall during such additional passes. This additional work for the plug-mill occupies much time, and reduces the output of the mill.

"My invention is designed to overcome this difficulty, so that the plug-mill may be used for its normal function of reducing the thickness and elongating the blank, without giving further passes on such mill for rounding up and working out the scratches, thereby reducing the number of passes that have been heretofore deemed necessary in the production of hot-rolled blanks, suitable for cold-drawing. For this purpose I subject the blank to a new operation, intermediate between the plug-mill and the draw-bench. In this additional step I pass the rolled blank through a reeling, or cross-rolling machine, in, which the blank is rounded up, its interior and exterior surfaces smoothed, and the scratches practically eliminated, giving a much better blank or tube for cold-drawing than could be produced on the plug-mill, no matter how many additional passes for rounding and smoothing were given."

Omitting for the moment reference to the advantages which he maintains are derived from this method of operation, the patentee claims:

"2. The herein described method of making seamless tubing which consists in rolling the pierced blank or billet in a plug-mill, then removing the blank and cross-rolling it over a mandrel to eliminate interior ridges or grooves and to true up the gage, substantially as described."

"4. In the method of making seamless tubing, the steps which consist in elongating and thinning the pierced billet in a plug-mill, and then removing the blank and cross-rolling it over a mandrel to smooth out the interior scores or grooves while the blank is hot, without materially changing the thickness of its wall, substantially as described."

"5. In the method of making seamless tubing, the following steps: Elongating and thinning the pierced billet by rolling it over a plug, then removing the hot blank and rolling it over a mandrel to smooth out its interior without changing its gage, and then cold-drawing the blank, substantially as described."

The complainant reads these claims as follows: First, a solid round billet is pierced by means of a pointed mandrel, the billet being forced onto the mandrel by means of cross-rolls or discs which give it a compound motion. The component motions are a circular rolling which enlarges the billet circumferentially, drawing the central metal out toward the circumference, and a forward spiral motion which as the circumference is enlarged forces the metal over the pointed mandrel.

The next step is to roll the pierced billet in a plug-mill. This comprises a pair of rolls forming approximately circular passes in which lie fixed mandrels. This mill works like an ordinary rolling mill, drawing the tube out to greater length and correspondingly reducing the wall thickness. This longitudinal rolling operation may be effected in two or more successive passes in the plug-mill. The rolling in the plug-mill is in a direction directly at right angles to the rolling that took place in the piercing mill. For this reason the transverse or spiral markings left by the piercing mill are eliminated in the longitudinal rolling operation; but by reason of wear on the plug and rolls, this plug rolling operation leaves substantial longitudinal markings on the outside and particularly on the inside of the tube.

The third step is cross-rolling the tube, not to expand it as in the

piercing operation, but to remove or soften the roughness left by the longitudinal plug-rolling operation. In this cross-rolling, or "reeling" operation, there is inevitably a certain reduction of the thickness of the wall, material or immaterial according as the operation is directed, When immaterial the reduction is negligible and the result, as required by the patent, is merely the smoothing out of the ridges and grooves left from the plug-mill operation.

The three steps referred to, piercing by cross-rolling, longitudinal rolling in a plug-mill, and again cross-rolling or reeling are performed on the metal while hot. The finish obtained by these three successive steps is sufficiently good to make a marketable tube for many uses. For producing finer tubes there is added to the three steps described a fourth step of drawing the tube cold lengthwise through a fixed annular die. This is the complainant's conception of the method of the patent. Claiming somewhat more than the inventor himself, it maintains that Nicholson was the first to conceive and put into practice the idea of making seamless tubes by the succession of steps embraced within this method and that the economies effected thereby are, first, a saving in cost by eliminating the smoothing passes formerly practiced in the plug-mill; second, the production (for the first time) of a hot finished tube so perfect as to be usable in some arts without subsequent cold-drawing; third, the providing of such a smooth tube for subsequent cold-drawing as to reduce the number of cold-drawing passes and to save wear on the dies and mandrels of the cold-draw bench. Finally, the complainant claims that Nicholson's invention created a rebirth of the seamless tube art, cheapened it extraordinarily and extended its use into fields which had been previously closed to it. If this were the story—or the whole story—of the patent we would find invention in the method and sustain the patent without hesitation. But there is more in the story than this. Nowhere does the maxim "origo rei inspici debet" apply more appropriately than to an invention which, through a patent, has been accorded a dominating place in the art. This takes us to the prior art; and necessarily so, because, whether we read the claims as starting with a pierced billet and consisting of two steps, first rolling the pierced billet in a plug-mill and next cross-rolling it in a reeler, or consisting of four steps, piercing the billet, rolling the pierced billet in a plug-mill, cross-rolling it in a reeler, and finishing it with a cold draw, the claims do not prescribe the means for taking these steps. Regarding the method as comprising four steps, Nicholson points out no particular means for piercing the billet. Obviously, then, he must mean piercing the billet as billets were pierced in the prior art. He prescribes no type of plug-mill. He refers, as a preference, to the plug-mill of Stiefel and himself (No. 700,195), but says that, "Any desirable type of plug-mill may be used." Coming to cross-rolling, he says, "the reeling mill may be of any desirable type so long as it performs the function of smoothing out the scores or grooves on the interior of the tube." Mentioning cold-drawing only in general terms, he must mean cold-drawing as practiced in the art. Therefore, the invention of the patent, if any, is to be found solely in the new order in which concededly old means are used.

286 F.—55

The art was not new when Nicholson entered it. Indeed, it was fifty or sixty years old and was well filled with inventions for which patents had been granted—now long expired—covering billet-piercing mills, plug-mills, reelers, cold-draw benches and methods for using them. Nicholson reached back into the art and appropriated the various mechanisms he found there and used them in the steps of his method for the same purposes, or for some of the same purposes, that others had used them before. We shall discuss but two or three of the many patents in the art.

In the British Patent to Dyson, No. 2,400 of 1862, sealed February 20, 1863, a reeler is shown for the purpose for which a reeler is used in the method of the patent in suit. The patent deals mainly with a rod, bar or shaft made by groove rolls in the ordinary manner, and provides that while still hot the metal piece should be introduced between the outer ends of the rolls. The patentee states:

"The rotation of these rolls causes the rod, bar or shaft to pass through the rolls and to issue from the opposite end circular, smooth and polished."

While the illustration goes only to the reeling of circular articles exteriorly, the patentee says:

"When applied to the manufacture of pipes and tubes the machinery remains as before described, but in addition to the guides I employ a mandrel between the rolls, over which the pipe or the tub is drawn."

So also in the United States Patent No. 41,836 the same inventor, in 1864, describes the mechanism in part as follows:

"And by virtue of the opposite inclination of the axes of the rolls it is drawn between them in a line nearly parallel to the axes of the rolls, while it is caused to rotate, and is thereby rendered cylindrical, smooth, and polished."

"My machine is also adapted to the rolling of tubes or pipes by the addition of a mandrel between the rolls over which the pipe or tube is drawn."

The testimony is to the effect that this is a disclosure of finishing tubes both outside and inside.

We are not comparing Dyson's polishing rolls with the polishing reeler preferably employed by Nicholson in his method, because Nicholson's patent does not cover any particular form of reeler except that it shall perform "the function of smoothing out the scores or grooves in the interior of the tube." Our purpose in quoting Dyson is to show that he was before Nicholson in using a reeler with which to smooth and polish a tube. For the same purpose we refer to United States Patent No. 149,310, granted in 1873, to Hayden for an improvement in machines for rolling tubing. It was intended by this patent that the tube should be drawn through rolls and at the same time revolve around a mandrel. In his specification Hayden says:

"But the mandrel may be dispensed with in cases where the interior of the tube is not required to be smooth. and when the diameter of the tube is to be reduced without materially reducing the thickness of the metal of the tube."

We agree with the learned trial judge that there is in this language a plain inference to be drawn by anyone skilled in the art, that if the interior of the tube is required to be smooth and if the wall of the

tube is not to be reduced, the mandrel should be used. In other words, it seems that Hayden knew that the mandrel had the function in the cross-rolling operation described by Nicholson and mentioned in each of his claims.

Hayden further says:

"The rolling operation takes place from end to end of the tube, and the tube is polished both internally and externally, the bore being of uniform size."

Here again we are not comparing the roll mechanism of Hayden with that which is preferred by Nicholson; we are quoting Hayden simply to show that he had already done what Nicholson did in the reeling step of his method.

For the same purpose we cite two more patents, United States Patents No. 401,144 and 401,145 granted to Flagler in 1889, one for an apparatus and the other for a method, covering the same inventive conception. In the method patent Flagler says that the object of his invention is to provide a method of manufacturing seamless tubes "in which the interior surface is highly finished" and "the tube itself straightened and given a true cylindrical form in one continuous operation." In practicing his invention the start, or first step, is taking a hollow ingot or blank, which corresponds with the pierced billet of the patent in suit. The second step is the drawing or forming of the blank of a length, diameter and thickness of wall in proportion to the finished tube to be made. This corresponds with the plug-mill operation of the patent in suit. For the third step, Flagler says:

"The tube or tubular blank thus formed is next subjected to the rolling action of concave cross rolls over a mandrel *to further reduce the thickness* of the tube and produce a spiral arrangement of internal fibre walls, to straighten said tube and impart a true cylindrical form thereto. * * * In some cases where the amount of reduction of the thickness of the tube coming from the first rolling operation is not great * * * the form of cross rolls shown in Fig. 2 is employed. In this the area of the pass formed by the working faces of the rolls remain substantially the same throughout."

Continuing, Flagler says:

"By my improved method I am able to produce a *thin* seamless tube having its fibres both internally and externally arranged spirally *and the interior of the tube given a high degree of finish* as well as straightening the tube and giving it a true cylindrical form in *one continuous operation.*"

In the companion apparatus patent No. 401,144 Flagler repeats the same idea:

"I am able to take a hollow ingot or blank, *and by a continuous operation* reduce the thickness of the walls of the same and produce a tube of the desired length, * * * and the tube *smoothed* and straightened so that no further manipulation of the tube is necessary."

This certainly means that by this method a hot finished tube is produced.

On Flagler's method patent (No. 401,145), and Stiefel and Nicholson's patent (No. 770,195), the Examiner rejected all the claims of Nicholson's application. These claims stated broadly the steps of the method without any limitation. When Flagler was cited against him,

Nicholson was called upon to distinguish his invention from that of Flagler. This he did by amending his claims.

In urging his amended claims in the Patent Office, Nicholson distinguished the cross-rolling step of his invention from the cross-rolling of Flagler by showing that aside from arranging metal fibres spirally Flagler cross-rolled for the double purpose of decreasing wall thickness and smoothing the interior of the tube while he cross-rolled for the single purpose of smoothing the interior. The amended claims were similar to the old claims except that they contained such limitations as cross-rolling over a mandrel "to smooth out the interior scores or grooves," "to true up its gage, without materially reducing the thickness of its wall," "without changing its gage." In distinguishing Nicholson from Flagler, the complainant aptly refers to the cross-rolling step with these limitations as a "mere" smoothing step. This limitation of cross-rolling to one of several uses of a prior art mechanism, is, we think, a narrow ledge on which to build invention, And so, evidently, thought the Examiner who rejected the amended claims. Speaking of them, he said:

"It was known that cross-rolling over a mandrel produced a reasonably smooth finished tube. It was known that longitudinal rolling over a plug produced a tube scored internally and no unexpected result therefore follows from rough rolling over a plug and smoothing over a mandrel by cross-rolling. Whether the cross-rolling reduced the wall or not, it seems to be obvious what the result will be."

The Examiner, however, was overruled by the Examiners in Chief and the claims as amended stand in the patent.

Besides those to which we have referred many of the patents cited are quite old and seem not to have made very great impressions upon the art. In this connection several facts are to be noted. One is that while, in 1903, the seamless tube art was old, it had not flourished except when supplying seamless tubes to the bicycle industry when at its height. With the collapse of that industry the great demand for seamless tubes fell off and the industry was at low ebb until at or about the time the invention of the patent in suit appeared. Therefore, if early inventions were substantially like the invention of Nicholson, it is quite pertinent to inquire why the art did not adopt them more promptly and why it did not recognize their merit until Nicholson came along.

The answers to these questions turn on something else that happened in the art at or about the time of the invention of the patent in suit. And just here there is a question as to the date of the invention. The patent application was filed December 15, 1904. The complainant maintains that the date of conception was about March 5, 1902, the date of the first reduction to practice in November 1902, and the date the invention was put into practical use in December, 1903. These dates of conception, reduction to practice and practical use are contested by the defendant on the ground that in December, 1903, Stiefel and the same John H. Nicholson applied for a patent for an invention on which they had been working for some time. The patent was granted in 1904 (No. 770,195). Throughout his application for the patent in suit, Nicholson, or his solicitors, referred to the Stiefel and Nichol-

son patent, indicating that that patent antedated the conception of the patent in suit by about a year and that the invention of the patent in suit grew out of difficulties encountered in developing and practicing the invention of Stiefel and Nicholson. Without deciding the precise dates of the conception and reduction to practice of the invention of the patent in suit, it is sufficient to say that they were contemporaneous with the appearance, in 1903, of the automatic plug-mill invented by Otto Heer. The advent of the automatic plug-mill was a capital event in the seamless tube art. The great problem in this art had to do, not with finishing tubes, but with the economical elongation of tubes and corresponding reduction of their walls before finishing them. Prior to Heer, plug-mills had been manually operated and the resultant tubes were relatively short and decidedly rough. Wall thickness had to be reduced by additional passes or subsequent operations. By Heer's automatic mechanism tubes were greatly elongated and wall thickness greatly reduced, and the tubes were advanced farther toward the finished product. When intended for some uses, tubes were wholly finished as to dimensions. There were, however, interior scores and grooves. which, as before, had to be disposed of in some way. The means at hand were cross-rolling and cold-drawing, both old in the art. Finishing tubes by cold-drawing was slow and costly. This was well known. If they could be finished while still hot, the time and expense of cold-drawing would be eliminated. This was obvious. Therefore Nicholson resorted to cross-rolling, which had long before been used for two purposes, first, reducing wall thickness, and second smoothing and polishing tubes made in a hand plug-mill. He adopted this means for the one purpose of polishing tubes made in an automatic plug-mill, first, as a step intermediate between the plug-mill and the draw-bench when tubes were to be finished by cold-drawing, and second, as a final step when tubes had been finished as to dimensions in the automatic plug-mill and remained only to be smoothed. Even if Nicholson were the first to conceive the four steps in the order named and the first to embody them in a method and reduce it to practice, his method, we think, was but the natural answer to a new call made by the automatic plug-mill when it came into the industry. We hesitate to say twenty years after the event that a thing was obvious, yet we are forced to say, in the light which the evidence throws upon the industry at that time, that when the automatic plug-mill produced tubes finished as to dimensions it was an obvious thing to smooth such finished tubes by smoothing means at hand in the industry, namely, by cross-rolling or cold-drawing, according to the uses to which the tubes were to be put and according to the desire of the operator. Important as is the bearing of the patent in suit on the industry and valuable as it would be to the owner if sustained, we are constrained to hold that the great changes wrought in the industry at or about the time of its appearance were due not to the invention of the patent but to the invention of the automatic plug-mill, and that with the automatic plug-mill economically finishing (for some uses) tubes of greater length and narrower walls, invention was not involved in

taking from this mill hot tubes wholly finished as to dimensions and smoothing them in a way known to the art.

Therefore we are of opinion that the decree below must be affirmed.